UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
AMELIA FLAVIN,
Plaintiff,

-against-

THE TERRYVILLE FIRE DISTRICT, and EDWARD SIMONETTI, in his official and individual capacities,

Defendants.
-----------------------------------------------------------------------X

**COMPLAINT**

No. 26-5550

**Jury Trial Demanded**

Plaintiff, Amelia Flavin, by and through her attorneys, FAMIGHETTI & WEINICK, PLLC, alleges upon knowledge as to herself and her own actions, and upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1. This is a civil action based on Defendants' violations of Plaintiff's rights as guaranteed to her by the First and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. § 1983 ("Section 1983").

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343.

3. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action alleged herein, occurred in this district.

## PARTIES

4. Plaintiff, Amelia Flavin, is a resident of the State of New York, County of Suffolk.

5. Defendant, the Terryville Fire District (the "District") was and still is a municipal fire district organized under the laws of the State of New York and is a public employer with a principal place of business at 19 Jayne Boulevard, Port Jefferson Station, New York.

6. The Terryville Fire Department (the "Department") is an operational unit of the District.

7. The Department does not exist as a legal entity separate and apart from the District.

8. Accordingly, the Department and District may be used interchangeably herein, but they are essentially one entity.

9. The Department exists only pursuant to a set of by-laws which set the rules and regulations for the operations of this sub-unit.

10. The District is controlled by the Board of Fire Commissioners (the "BOFC"), comprised of five commissioners elected by residents of the District.

11. The BOFC approves all policies and procedures of the District and Department.

12. Defendant, Edward Simonetti, is a resident of Suffolk County. At all relevant times, Simonetti was the Chief of the Department, meaning the highest ranking member of the Department and its Chief Executive Officer, answering directly to the BOFC. Simonetti's responsibilities are set pursuant to New York State Town Law, and to the extent they do not conflict, pursuant to the Department's by-laws and the District's rules and regulations.

**FACTS**

**Volunteer Fire Service Pride**

13. Outside of New York's major cities such as New York City and Buffalo, firefighting services are primarily provided to New York's communities via volunteer fire departments.

14. In other words, New York State relies heavily on volunteers to staff its fire departments.

15. Because it is so reliant on volunteer firefighters, New York has adopted laws and rules to help promote the recruitment and retention of volunteer firefighters.

16. For example, a Length of Service Award Program ("LOSAP") acts as a retirement benefit for volunteers, providing a modest monthly payment to volunteers based on the number of years they volunteer, payable when the volunteer reaches a set age.

17. Further, volunteers may be eligible for property and other tax reductions and benefits.

18. These benefits are sufficient to constitute "remuneration" under employment statutes such as Title VII.

19. But, these benefits are nonetheless quite modest, and rarely if ever, are these benefits the motivating reason that individuals initially seek membership with the volunteer fire service or that they maintain membership and stay active.

20. Rather, most individuals participate with the volunteer service because of a sense of community; not just the community that the particular department services, but the larger fire service

community, frequently referred to as a brother/sisterhood.

21. Indeed, it is the pride of being a part of the firefighting brother/sisterhood that truly motivates most volunteer firefighters.

22. Indeed, in its own words, the Department boasts as a benefit of membership, "friendships that will last a lifetime" and in a letter to prospective members, it conveys to the applicant that in return for giving time to serve to the community, "you will experience a great sense of pride and personal accomplishment."

23. In addition to the pride felt towards the greater brother/sisterhood, firefighters take great pride in the particular fire department of which they are a member.

24. The pride is so profound that volunteer firefighters often display various markings to identify themselves as firefighters.

25. For example, volunteer firefighters will often wear shirts, sweatshirts, jackets, and hats which bear the name and/or patch of their fire department, which they wear "off-duty."

26. Indeed, volunteer firefighters will wear such apparel, without regard to the occasion, be it a trip to the grocery store, visiting with family or friends, or going to a bar/pub.

27. The District/Department provides some such "off-duty" apparel to its members, and does not maintain a rule, policy, or procedure, about when/where members may wear such apparel.

28. Some volunteer firefighters buy an official "Volunteer Firefighter Custom Plate" for their vehicle, made available by the New York State Department of Motor Vehicles.

29. The license plates offer no special benefit other than allowing firefighters to publicly display their status as a volunteer firefighter. See https://dmv.ny.gov/plates/volunteer-firefighter, last visited July 15, 2026.

30. If not marking their vehicles with special DMV plates (or in addition thereto), some firefighters will also place stickers of their fire department's patch on their vehicles.

31. Further, volunteer firefighters often carry with them their fire department identification card and/or badge, to verify their membership status for retail store discounts, or other purposes.

32. Volunteer firefighters show pride in their department in other ways, as well.

33. The various departments in a local "battalion", a county, or even across the state, hold friendly competitions with drill teams, softball teams, and bowling teams.

34. An unspoken friendly "competition" often exists when multiple fire departments are alerted to the same fire, with the first arriving department or company proudly declaring that they were "first due" for the fire.

35. Firefighters meticulously clean their apparatus before parades, where the appearance of both a department's firefighters and its trucks may be judged, with awards issued to the best appearing trucks, departments, members, etc.

36. Many volunteer firefighters devote substantial time during the Memorial Day weekend to cleaning their equipment and uniforms, in preparation for marching with their department in a community Memorial Day parade.

37. They do so because of pride.

38. In sum, volunteer firefighters take immense pride, not only in their membership with the larger fire service brother/sisterhood, but also with their particular fire department.

39. Many firefighters take any and all opportunity to publicly display their pride.

40. Reasonable members of the community understand that firefighters take pride in what they do and that they demonstrate that pride through many of the ways set forth above.

41. No reasonable member of the community would believe, for instance, that a Department member wearing a Department issued t-shirt or hat at a Mets baseball game while cheering for the Mets, signifies that the Department or District takes such position or that the member is expressing the District and Department's endorsement of the team.

42. No reasonable member of the community would believe, for instance, that a Honda Accord, Ram truck, or BMW sports sedan with a sticker of the Department's patch means that the vehicle is an official vehicle of the District or Department.

43. Rather, reasonable community members understand the individual is merely identifying

their association with the District/Department because of pride.

44. Indeed, the Department sells t-shirts to the community with the Department name on them.

45. Thus, even individuals who are not members or firefighters, can publicly display an association with the Department and the District/Department has no reasonable interest in limiting that display. E.g. https://events.elitefeats.com/26terryville (noting participants in a 5k run will receive a "TERRYVILLE FD 5K TEE SHIRT").

**Background Information About Facebook Accounts**

46. Facebook is a social media platform which lets people create personal profiles, connect with friends and family, share posts (text, photos, videos), join groups, follow pages, and message each other.

47. Facebook distinguishes between "profiles" and "pages." See https://www.facebook.com/business/help/1034727950288693.

48. Profiles can be used only by individuals and are intended "for personal use." Id.

49. Pages, on the other hand, are available only for businesses, creators, public figures, organizations, non-profits, politicians, and local shops/stores. Id.

50. In other words, individuals cannot use "Pages" and businesses, organizations, and non-profits cannot use "profiles."

51. Profiles and pages look different.

52. To interact with profiles, users see buttons such as “add friend.”

53. To interact with pages, users see buttons such as “like/follow.”

54. Further, on pages, just below the page name users will see a category such as “public figure,” “local business,” or “product/service.”

55. On a profile, no category will display; instead, if made public and available, some personal information about the user will display, such as job information or the city where the user lives.

56. Indeed, Facebook allows users of profiles to display a wide range of information about themselves.

57. Profiles can display a user's current and former employers, places lived, family and relationships, and “life updates.”

58. Users can choose different privacy levels for such information.

59. For example, by making a profile “private,” only other users who are connected to the private user as “friends”, can view that profile's information.

60. Any casual user of Facebook understands the difference between an individual "profile" and a business/organization "page".

**Background Concerning ICE**

61. A cornerstone of President Trump's political movement has been immigration policy.

62. During his first term, the policy focused on building a wall along the U.S.-Mexico border to control the flow of people across the border. See https://www.bbc.com/news/world-us-canada-46824649 (noting the wall was a "signature promise").

63. For his 2020 campaign, President Trump campaigned on "overhauling the nation's legal immigration system." See https://www.nbcnews.com/politics/white-house/trump-plays-middle-2020-legal-immigration-focus-n1006671.

64. President Trump's second term immigration policy has focused on deportation of individuals who are alleged to be unlawfully in the country. See https://apnews.com/article/donald-trump-california-immigration-customs-enforcement-newsom-0482a8935419d88986b890b18db5cc03.

65. To affect such policy, the President has deployed Immigration and Customs Enforcement ("ICE") Agents to cities across the country with a goal of "remov[ing] 1 million immigrants without status annually and housing 100,000 people in immigration detention centers." Id.

66. The policy and the efforts to implement the policy, have faced backlash.

67. Indeed, protests have erupted in cities across the country, demonstrating strong

opposition to the President's plan and actions. Id.; https://thehill.com/homenews/administration/5967724-immigration-protests-violence-report/ (noting "Mass protests in opposition to removals were sparked in places across the country last year").

68. In other words, the President's immigration policy is controversial and a significant matter of public concern.

**Facts Concerning Firefighter Flavin and the Events Giving Rise to this Action**

69. In or about 2009, Flavin created a Facebook "profile" account.

70. Flavin created the account using an alias for her username, but later changed the username per Facebook rules, using her maiden name "Amelia Yatauro."

71. But, since approximately 2017, Flavin uses her married name "Flavin", outside of Facebook.

72. Flavin did not change her Facebook profile name and it remains "Amelia Yatauro," to date.

73. The Department also maintains a Facebook presence, having a Facebook "page."

74. The main "landing page" for the Department's Facebook page indicates it is indeed a "page" (i.e. an account belonging to an organization, not an individual), it specifically notes that it is a "fire station," the contact information identifies an email address of "chiefs@tfdmail.org" and the phone number and physical address listed on the page are those belonging to the Department and

District, and the website url listed points to a website which purports to be an official website of the Department and District.

75. The page posts information such as fire safety tips, department activities, photos of Department firefighters training, and posts commemorating holidays, such as Memorial Day.

76. Moreover, other "official" sub operational units of the District maintain Facebook pages.

77. For instance, Terryville Fire Department Engine Company 2 maintains a "page" identified as a "fire station."

78. Engine Company 2's page identifies the commanding officers of the sub-unit, including its Captain and Lieutenants.

79. In sum, the District and its sub-units maintain "official" and authorized internet presences, including on Facebook.

80. In June 2015, Flavin joined the Department as a volunteer firefighter.

81. As volunteer firefighter, Flavin's job responsibilities included fire suppression, rescue services, and provision of emergency medical care, among other things.

82. In November 2015, however, Flavin resigned.

83. At the time, Flavin was preparing for the birth of her first child and the

District/Department refused to provide Flavin with a leave absence, citing a by-law rule prohibiting probationary members from taking leave.

84. Thus, the District/Department refused to provide Flavin with a pregnancy accommodation.

85. In or about November 2016, Flavin re-joined the Department.

86. By May 2017, Flavin completed her initial trainings and she transitioned from "probationary" firefighter to full-duty firefighter.

87. Thus, Flavin was in all ways qualified for the position.

88. As a volunteer firefighter, Flavin was eligible to enjoy benefits of membership including LOSAP, tuition assistance, and property tax "deductions."

89. Moreover, as a volunteer firefighter in New York State, Flavin enjoyed the protections of General Municipal Law § 209-l ("209-l"), which prohibits "removal" of volunteer firefighters from membership except for misconduct or incompetence, stating in relevant part:

> Removals on the ground of incompetence or misconduct, except for absenteeism at fires or meetings, <u>shall be made only after a hearing upon due notice</u> and upon stated charges and with the right to such officer or member to a review pursuant to article seventy-eight of the civil practice law and rules. Such charges shall be in writing and may be made by any such authority. The burden of proving incompetency or misconduct shall be upon the person alleging the same.

90. "Removal" under 209-l has been interpreted to include suspensions and terminations, though 209-l allows for suspension of members after charges are filed, and pending their disposition by

hearing. Dushane v. Leeds Hose Co. #1, 6 F. Supp. 3d 204, 215-16 (N.D.N.Y. 2014).

91. Proud of her service, Flavin is not shy about showing her pride in many of the ways described above.

92. Like many if not all of her fellow volunteers, Flavin regularly wears shirts and jackets provided by the District displaying the "Terryville Fire Department" name and/or patch.

93. Also like many of her fellow volunteers, Flavin identified her membership with the Department on her Facebook profile.

94. Facebook profiles do not have a section to list volunteer organization memberships, so volunteer firefighters who want to include their membership as part of their profile, do so under the "work and education" section.

95. This is what Flavin did, noting Terryville Fire Department as part of her work history.

96. Flavin is not the only Department member to do this.

97. In fact, among likely many others, members Tyler Cespites, Chris Gorman, and Domingo Peralta post that they "work" at "Terryville Fire Department – NY."

98. Moreover, each of them displays what appears to be an official Terryville Fire Department patch next to the posting identifying their association with the Department.

99. For years, Flavin's membership with the District/Department was relatively unremarkable.

100. She performed her responsibilities well and was an active and respected member.

101. Indeed, the Department bestowed upon Flavin an “EMS Award” for outstanding performance during a rescue operation.

102. Conflict arose for the first time in December 2025.

103. On December 28, 2025, Simonetti suspended Flavin for 15 days, with an 80 day “social suspension.”

104. Pursuant to New York Town Law 176-a, the fire chief is empowered to suspend members for “improper conduct”, but only “subject to the action of the board of fire commissioners at its next meeting.”

105. In other words, fire chiefs in New York may not unilaterally suspend members, except for the limited time allowed by Town Law.

106. Rather, they may issue a suspension only up to the time of the next board meeting, then the board must decide whether to issue charges or not.

107. On December 31, 2025, Simonetti imposed on Flavin another suspension of 45 days and a “social suspension of 90 days.”

108. This once again violated Town Law and 209-l.

109. On January 29, 2026, Flavin used her Facebook account to post a comment to another user's original post:

> According to a former police/ice raid member, the thing raiders are most worried about is: water balloons filled with black paint, oil and a bit of sand. It can cover drivers windshields, goggles and oil is [illegible] from a spark. It's non lethal and not considered a weapon. Just a tip I've read in a comment somewhere.

(the "Post").

110. Flavin made the Post in an online discussion about ICE.

111. The Post does not incite violence or suggest that anyone take action against ICE.

112. At worse, the Post offers a form of civil disobedience to protest ICE, which constitutes protected First Amendment speech. See e.g. Jenkins v. Miller, 12-cv-184, 2017 U.S. Dist. LEXIS 160793, *104 (D.Vt. Sept. 29, 2017) (citing Brandenburg v. Ohio, 395 U.S. 444 (1969)).

113. The Post itself does not identify Flavin as a member of the District/Department nor did Flavin explicitly write that she was posting as a member of the District/Department or on its behalf.

114. For an observer of the Post to know in any way that Flavin was a member of the Department, the user would have to "click" on Flavin's name to display her Facebook account profile on the screen.

115. Along with Flavin's post, hundreds of other Facebook users also made comments on the post on which Flavin had posted her comment.

116. Flavin made the Post while off-duty, off property, and entirely on her own private time.

117. In fact, Flavin was serving her unlawful suspension at the time of the Post and could not have made the Post while on duty or while otherwise serving as a Department firefighter.

118. On February 1, 2026, Simonetti issued a “Statement of Charges and Notice of Termination” to Flavin.

119. Simonetti delivered the notice to Flavin electronically, in .pdf format, thus Flavin had no opportunity to be heard on the charges and termination, before termination.

120. The “charges” vaguely referenced “statements and commentary” Flavin allegedly made on a “social media platform,” and it provided no further specificity concerning the “statements and commentary.”

121. Simonetti also conveyed that he had “hereby terminated” Flavin “from membership in the Terryville Fire Department, effective February 1, 2026.”

122. Specifically, Simonetti wrote:

> **NOTICE OF TERMINATION**
> **PLEASE TAKE FURTHER NOTICE** that, pursuant to Section 176-a, Duties of the Fire Chief, of the Town Law, and the authority granted under the Terryville Fire Department By-Laws and Chief's policies, you are hereby **terminated** from membership in the Terryville Fire Department,

effective February 1, 2026.

(emphasis in the original).

123. Simonetti stated that Flavin's conduct violated Department policies, including a "social media policy."

124. No social media policy exists in the By-laws, thus the alleged infraction was not a violation of the by-laws.

125. The termination violated 209-l and exceeded Simonetti's authority under Town Law.

126. For these reasons and also because Simonetti terminated Flavin without providing her even a minimal opportunity to be heard before the deprivation, Simonetti and the District deprived Flavin of constitutionally required due process.

127. 209-l is an established state procedure for the termination of a volunteer firefighter such as Flavin, thus the termination is not a random and unauthorized act.

128. Because Simonetti relied on the Department social media policy to charge and terminate Flavin, his actions constitute conduct on the part of the District.

129. Simonetti's notice further stated that the termination was subject to "review and action" by the Board of Fire Commissioners and that Flavin was required to initiate such a review if she chose to.

130. This is a false statement.

131. Pursuant to law, Simonetti was limited to suspending Flavin until the Board's next meeting and at that next meeting, the Board could choose to serve Flavin with charges and to continue her suspension pending a hearing pursuant to 209-l.

132. 209-l does not put the onus on Flavin to request a hearing.

133. On May 19, 2026, the District purportedly served charges on Flavin again, even though she had already been terminated on February 1, 2026.

134. On June 30, 2026, the District purportedly held a hearing on the charges at which Flavin appeared.

135. At the hearing, Simonetti testified that he viewed other posts by Flavin and that "statements of her view . . . could reflect poorly on the Terryville Fire Department and its members" and that she should be terminated because of that.

136. Thus, Simonetti confirmed that he imposed the penalty of termination on Flavin because of her viewpoints.

137. On August 7, 2026, Hearing Officer Brian Murphy indicated that he "recommend[s]" terminating Flavin.

138. On August 13, 2026, the District voted to "terminate" Flavin, again, even though

Simonetti terminated her in February.

**FIRST CLAIM**

(Fourteenth Amendment- Due Process via 42 U.S.C. § 1983)

139. On December 28, 2026, while acting under color of law, Simonetti suspended Flavin for 15 days and 90 days of "social suspension." Prior to the suspension, Simonetti did not provide to Flavin notice of the charges against her nor did he provide her a hearing (or any other right to be heard) as was her right under 209-L.

140. The District is liable under Monell v. Dep't of Soc. Servs., because the acts were taken based on a purported violation of Department policy. See Persaud v. City of New York, Persaud v. City of New York, No. 22-CV-2919, 2024 U.S. Dist. LEXIS 87727, *24-25 (S.D.N.Y. May 14, 2024).

**SECOND CLAIM**

(Fourteenth Amendment- Due Process via 42 U.S.C. § 1983)

141. On December 31, 2026, while acting under color of law, Simonetti suspended Flavin for 45 days and an "additional" 90 days of "social suspension." Prior to the suspension, Simonetti did not provide to Flavin notice of the charges against her nor did he provide her a hearing (or any other right to be heard) as was her right under 209-L.

142. The District is liable under Monell v. Dep't of Soc. Servs., because the acts were taken based on a purported violation of Department policy. See Persaud v. City of New York, Persaud v. City of New York, No. 22-CV-2919, 2024 U.S. Dist. LEXIS 87727, *24-25 (S.D.N.Y. May 14, 2024).

**THIRD CLAIM**

(Fourteenth Amendment- Due Process via 42 U.S.C. § 1983)

143. On February 1, 2026, while acting under color of law, Simonetti terminated Flavin. Prior to the termination, Simonetti did not provide to Flavin notice of the charges against her nor did he provide her a hearing (or any other right to be heard) as was her right under 209-L.

144. The District is liable under Monell v. Dep't of Soc. Servs., because the acts were taken based on a purported violation of Department policy. See Persaud v. City of New York, Persaud v. City of New York, No. 22-CV-2919, 2024 U.S. Dist. LEXIS 87727, *24-25 (S.D.N.Y. May 14, 2024).

**FOURTH CLAIM**

(First Amendment – Free Speech via 42 U.S.C. § 1983)

145. Simonetti terminated Flavin based on her protected speech.

146. Flavin's speech touched on a matter of public concern, to wit, ICE's operations and conduct during the winter of 2026.

147. ICE's conduct has absolutely no relationship whatsoever to Flavin's job responsibilities as a volunteer firefighter and she was off duty posting on a forum used by millions and millions of Americans to express their views.

148. Accordingly, Flavin was speaking as a citizen.

149. Flavin's post could not reasonably impact Defendants' fire department operations.

150. For one thing, Flavin posted under the name “Amelia Yatuaro”, but she uses the name Amelia Flavin with the fire department.

151. Thus, no reasonable individual relying on the Department's services could confuse Flavin as the "Yatauro" who made the Post.

152. Further, no reasonable Facebook user could genuinely and legitimately believe that Flavin was speaking on behalf of the District/Department.

153. The District is liable under Monell v. Dep't of Soc. Servs., because the acts were taken based on a purported violation of Department policy, namely, the Social Media Policy. See Persaud v. City of New York, Persaud v. City of New York, No. 22-CV-2919, 2024 U.S. Dist. LEXIS 87727, *24-25 (S.D.N.Y. May 14, 2024).

WHEREFORE, Plaintiff demands judgment against Defendants, where applicable, for all compensatory, emotional, physical, and punitive damages (where applicable), injunctive relief including a temporary restraining order, preliminary injunction, and permanent injunction compelling Defendants to immediately reinstate Flavin, liquidated damages, (where applicable), interest, and any other damages permitted by law. It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled. Plaintiff demands a trial by jury.

Dated: Melville, New York
September 8, 2026

FAMIGHETTI & WEINICK, PLLC
*Attorneys for Plaintiff*
25 Melville Park Road, Suite 235
Melville, N.Y. 11747
(631) 352-0050

By: __/s/_Matthew Weinick__________
MATTHEW WEINICK